**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| JULIANA ROUSE | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| THE CARMEL BY VILDALTA | § | |
| | § | |
| Defendant | § | **JURY TRIAL DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Juliana Rouse, for her Complaint against Defendant The Carmel by Vildalta, would show as follows:

**I.**

**PARTIES**

1. Plaintiff is an individual.

2. Defendant is, on information and belief, a for-profit corporation and may be served with summons and this Complaint through its registered agent, CT Corporation, at 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

**II.**

**JURISDICTION AND VENUE**

3. This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 based on Plaintiff's claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

4. This Court has jurisdiction over this action under 28 U.S.C. § 1391 based on all events and omissions underlying Plaintiff's claims occurring in this District and Division.

## III.

## FACTS

5. Plaintiff is white.

6. On December 24, 2022, Plaintiff applied for a full-time lease consultant position online through Indeed.

7. Plaintiff interviewed with two Hispanic women, property assistant manager Norma Davis ("Davis"), and property manager Tania Magana ("Magana") at the Carmel apartment complex in Garland, Texas on December 29, 2022.

8. Plaintiff was interviewed by Davis and Magana in the lobby of the Carmel property. They reviewed Plaintiff's application that included Plaintiff's work history.

9. Plaintiff received her offer of employment on January 4, 2023. Plaintiff accepted.

10. Following Plaintiff's offer of employment, Magana emailed Plaintiff, instructing her to report to the Colinas Ranch office at 3206 Walnut Hill Road, Irving, Texas, on Monday, January 9, 2023, where Plaintiff will be trained from Monday, January 9th through the 12th, by a woman named Maria G. ("Maria").

11. Plaintiff then received a phone call from Davis stating that Maria was not going to be available to train her, and to report to the Carmel in Garland, Texas, to begin her training on January 9.

12. Plaintiff reported to the Carmel on the 9 and trained through Tuesday, January 10 using a computerized training program. After her training, Plaintiff understood the functions/duties of her position.

13. The company uses the ILM apartment rental computer program for their residents. It is an "onsite" computer program. Plaintiff had not yet been trained to operate the ILM program. However, Maria informed Plaintiff that she will be trained on the program sometime in the near

future. Maria said the training session would only take 30 minutes to complete, and the ladies in the office will help Plaintiff.

14. On Wednesday, January 11, 2023, Plaintiff began work. That day, Plaintiff received a subpoena to appear in Court that Thursday, January 12, 2023. Plaintiff advised Davis, Magana and Maria of this subpoena.

15. After fulfilling the duties for the subpoena, Plaintiff reported to work that following Friday, January 13, 2023. On that day, Plaintiff gave Maria a copy of the subpoena notice she received, and Maria said, "Okay. Fine. Thank you."

16. Plaintiff completed her training with Maria. Maria directed Plaintiff to report to the Carmel in Garland, Texas, on Monday, January 16, 2023, at 8:30 AM sharp. Plaintiff did so by arriving at 8:25 AM.

17. The Plaintiff began to lose her voice at work. Davis looked at Plaintiff and said, "You look pale." Plaintiff was not feeling well. However, she stayed to complete all her daily duties.

18. On January 16th, a corporate representative named Carlos ("Carlos") was visiting the property. By noon, the only people in the office were Plaintiff and Carlos. Carlos also made a comment to Plaintiff saying, "Are you okay? You don't sound well." Again, Plaintiff stayed to fulfill her duties at the front desk, answering phones and greeting residents.

19. Later that day, Plaintiff answered the phone. The caller asked for the status of her apartment rental application. Plaintiff checked the computer. The information entered into the computer specifically stated the caller had already signed her rental agreement. Faced with conflicting information from the caller and the computer, Plaintiff asked Carlos to assist her in

resolving the conflict. As it turned out, the caller was correct, and she had never signed her rental agreement.

20. Following the call, Carlos explained to Plaintiff that such a situation should never exist, and he would, "Have a word with Tania." Plaintiff asked Carlos what she should communicate to the caller. Carlos instructed her to tell the caller management would be contacting her because Plaintiff did not have the information she was asking about. Plaintiff followed his instruction.

21. Later that same day, a plumber visited the lobby and asked Plaintiff for keys to access an area he needed to service. Plaintiff was not given any keys from management, so she asked Carlos for direction. Carlos advised Plaintiff to send a message to the lead maintenance man for the property. At 2:00 PM, Plaintiff messaged the lead maintenance man advising him of the needed keys for the plumber. The maintenance man responded, directing Plaintiff to use his lock code number and his PIN. Plaintiff complied. Soon after, the maintenance man texted Plaintiff asking if she was able to get the keys, and she said yes.

22. At 2:45 PM, Plaintiff began feeling nauseous and ended up vomiting in the bathroom. Carlos directed her to go home.

23. Plaintiff left work at approximately 3:00 PM and ended up going straight to bed.

24. The following morning, Plaintiff awoke with a fever of 102-degrees and severe body aches. She took Tylenol while getting ready for work. While driving, Plaintiff had to pull over to vomit. Plaintiff contacted Davis and advised her what was happening. Plaintiff told Davis that she was going to go directly to the Emergency Room. Davis responded with, "Are you coming in?" The Plaintiff said no because she was running a high fever and vomiting. Davis's immediate response to Plaintiff was, "You should not have talked to corporate. Tania is mad!" Plaintiff asked

Davis what Magana was mad about because all Plaintiff did was ask for help understanding an apparent conflict.

25. Davis's response was, "It is just never going to work. You are white. We can't have people talk to corporate behind our backs." Plaintiff responded, "Okay, Norma. I am literally pulling into the Emergency Room. Have a good day." Davis responded, "Okay."

26. Plaintiff arrived at the Emergency Room at 8:00 AM. The medical staff examined Plaintiff and diagnosed her as having bronchitis. With this diagnosis, the Doctor advised Plaintiff to rest for a number of days. Being a single mother, Plaintiff could not afford to miss work. So the Doctor wrote her a medical release stating Plaintiff needed to rest for two days. Plaintiff was also given a prescription.

27. At 10:00 AM, Plaintiff texted Davis advising her of her diagnosis. At 2:34 PM, Plaintiff received the following text from Magana:

> **"Tania:** **Hey, hope you are feeling better. Bring your clearance note from your doctor. We will see you tomorrow.**
>
> **Me:** **My doctors told me I needed two days off. Still may have a fever. If I wake up tomorrow with no fever, I will bring in my doctor's note.**
>
> **Tania:** **If your doctor took you out of work, you need a clearance letter from your doctor."**

28. Plaintiff immediately sent Magana a photo of the Doctor's release via text. Plaintiff also asked Magana if the two days were for Thursday and Friday, as it was Wednesday. Magana responded yes. Plaintiff did not go back to work on Wednesday and slept.

29. Plaintiff returned to work arriving 10-minutes before her scheduled shift. When in the parking lot, Plaintiff observed Davis, Magana and a man that Plaintiff didn't recognize, standing together. Plaintiff walked over towards them to greet them, and Magana said, "Oh, here comes *weda*." "Weda" is a Spanish racist term for "white girl."

30. Davis opened the doors to the lobby at 8:30 AM, and Plaintiff proceeded to her desk. While opening her computer, Magana and Davis were standing in earshot of the Plaintiff. She heard Davis ask Magana, "Why is she still here?" Magana responded in Spanish, "I will deal with it in a second."

31. Magana then approached Plaintiff, and said she needed to see Plaintiff in her office. Plaintiff complied. Davis was already in the room. Magana's computer had a camera attached to it that films and records visitors who are speaking with Magana while in her office. Curiously, Magana was positioned between Davis and Plaintiff and the camera – blocking the camera lens from recording any event or audio.

32. Magana asked Plaintiff, "How are you feeling?" Plaintiff responded she was still feeling bad. Plaintiff then gave Magana her doctor's release. Magana then fired Plaintiff. Magana then told Plaintiff why she was firing Plaintiff:

> **"You are not going to be able to work here because you are white. And I want my whole team to be Hispanic. This is not going to work. Grab your things and leave."**

Plaintiff then asked for a copy of her doctor's note. Magana refused. Plaintiff then took the note off Magana's desk, made a copy of it, and returned the copy to Magana. Plaintiff gathered her personal items and left.

33. Plaintiff immediately drove to Defendant's corporate office in Irving, Texas. She met with Maria and explained the situation. Plaintiff then requested the corporate telephone number for the human resources office so she could report what happened. Maria gave her the phone number. Plaintiff proceeded to call three separate times and left three separate messages with her contact information. Plaintiff never received a response.

34. On January 19, 2023, at 11:39 AM, Plaintiff sent an email to Ariana, the corporate human resource director, but again, Plaintiff received no response.

## IV.

## CAUSES OF ACTION

35. For her first cause of action, Plaintiff claims she was subjected to discrimination by Defendant on the ground of race and national origin in violation of the Civil Rights Act of 1964. Plaintiff is accordingly entitled to recover her compensatory, damages, punitive damages, prejudgment interest, attorney's fees and litigation costs.

36. For her second cause of action, Plaintiff claims she was subjected to retaliation by Defendant on the ground of race and national origin in violation of the Civil Rights Act of 1964. Plaintiff is accordingly entitled to recover her compensatory damages, punitive damages, prejudgment interest, attorney's fees and litigation costs.

37. For her third cause of action, Plaintiff claims she was subjected to discrimination by Defendant on the ground of race in violation of U.S.C § 1981. Plaintiff is accordingly entitled to recover compensatory damages, punitive damages, prejudgment interest, attorney's fees and litigation costs.

38. For her fourth cause of action, Plaintiff claims she was subjected to retaliation by Defendant on the ground of race and in violation of U.S.C § 1981. Plaintiff is accordingly entitled to recover her compensatory damages, punitive damages, prejudgment interest, attorney's fees and litigation costs.

## V.

## **JURY TRIAL DEMANDED**

39. Plaintiff hereby demands trial by jury of all claims for which he is entitled to demand a jury trial.

## VI.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear and answer herein, and that upon final trial, Plaintiff have and recover the following relief against Defendant:

(1) Judgment for actual damages in the amount of past and future lost earnings and benefits and damages to past and future earnings capacity;

(2) Liquidated and/or statutory damages;

(3) Punitive/exemplary damages;

(4) Preliminary and permanent injunctive relief reinstating Plaintiff to hIS position with full seniority and other benefits as if he had never been discharged;

(5) Prejudgment and postjudgment interest at the maximum legal rate;

(6) All costs of court;

(7) Attorney's and expert fees; and

(8) Such other and further relief to which Plaintiff may be justly entitled.

DATE: March 30, 2023

Respectfully submitted,

/s/ *Christopher C. Antone*
Christopher C. Antone
State Bar No. 790186
cca@kilgorelaw.com

        Kilgore & Kilgore, PLLC
        3141 Hood Street, Suite 500
        Dallas, Texas 75219
        (214) 379-0832
        (214) 379-0840 (telecopy)

        **ATTORNEY FOR PLAINTIFF**